# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Event Sales, Inc., | No. 23-cv-3444 (KMM/ECW) |
| Plaintiff/Counter-Defendant, | |
| v. | **ORDER** |
| The TJX Companies, Inc.; Federal Express Corporation, *a Delaware Corporation*; and FedEx Ground Package System, Inc., *a Delaware Corporation*; | |
| Defendants/Counter-Plaintiffs. | |

Event Sales, Inc. and The TJX Companies, Inc. agreed to the terms of a Salvage Agreement under which Event Sales purchased salvage merchandise from TJX. To facilitate the shipment of salvage goods, Event Sales provided TJX pre-printed Federal Express Corporation ("FedEx")[1] shipping labels that TJX would place on boxes containing the merchandise. FedEx then picked up the packages from TJX locations and billed Event Sales for the shipments under a

---

[1] One bit of housekeeping is necessary to provide a clear record. In its Complaint, Event Sales named Federal Express Corporation, FedEx Ground Package System, Inc., and FedEx Freight, Inc. as the FedEx Defendants. The Court dismissed "the case against FedEx Freight, Inc." on January 16, 2024 pursuant to the parties' stipulation. Stip., Doc. 19; Dismissal Order, Doc. 21. The wording of the stipulation and the dismissal order suggests that FedEx Freight, Inc. may have remained a party for purposes of the FedEx parties' counterclaim against Event Sales, and the docket text associated with the FedEx parties' Answer and Counterclaim could be read to imply the same. *See* Doc. 13 (docket text). However, the FedEx parties' counterclaim is only asserted by Federal Express Corporation and FedEx Ground Package System. FedEx Countercl. ¶¶ 1–2, Doc. 13 at 13. Those are the only two parties on whose behalf FedEx's motion for summary judgment is filed. Doc. 53. Accordingly, the Court refers to Federal Express Corporation and FedEx Ground Package System, Inc. collectively as "FedEx" throughout this Order, and it considers FedEx Freight, Inc. to have been dismissed as a party to this suit for all purposes, including the FedEx parties' counterclaim.

separate contract. This arrangement worked well for many years, but things took a turn for the worse in 2022, and this suit followed.

Event Sales alleges that TJX breached the Salvage Agreement in several ways, including by sending merchandise that Event Sales could not resell; packaging the goods in oversized cartons that caused Event Sales to incur excessive shipping costs with FedEx; packaging the goods so poorly they were damaged in transit; and drastically increasing the volume of shipments, impacting Event Sales' labor costs and eliminating any chance it could profit from the arrangement. Event Sales seeks damages and a declaratory judgment on its breach-of-contract claim against TJX. It also asserts that TJX is liable for unjust enrichment and for violating the Minnesota Consumer Fraud Act (Minn. Stat. § 325F.69). With respect to FedEx, Event Sales asks the Court to declare that it does not owe millions of dollars in shipping costs and that the unpaid balance on its FedEx account should instead be paid by TJX. Both TJX and FedEx assert counterclaims against Event Sales for breach of contract claiming that Event Sales has failed to provide payment as required by their respective contractual agreements.

This matter is now before the Court on the Defendants' motions for summary judgment and to exclude expert testimony. TJX seeks summary judgment on Event Sales' claims and its own counterclaim for breach of contract. TJX also moves to exclude evidence from Darren Kray, who is Event Sales' expert witness concerning damages. Similarly, FedEx seeks summary judgment on Event Sales' claim for declaratory judgment and partial summary judgment on its

breach-of-contract counterclaim against Event Sales.[2] As explained below, the Court grants Defendants' summary-judgment motions.

## BACKGROUND

Event Sales is a Minnesota-based salvage vendor that purchases salvage merchandise from retailers at low cost and then resells it to its own customers at a markup. TJX is an off-price retailer of clothing and home goods, with thousands of stores around the United States operating under recognizable brands such as TJ Maxx, Marshalls, HomeGoods, Homesense, and Sierra. FedEx is a shipping company that Event Sales used to deliver salvage merchandise from TJX to Event Sales' own locations.

## I.    The Parties' Contractual Relationships

TJX and Event Sales have maintained a salvage-merchandise business arrangement for many years. The most recent contract under which they operated became effective on January 12, 2015 ("Salvage Agreement").[3] Kappelman Decl. (Doc. 66), Ex. 2. The Salvage Agreement continued originally for a term of two years, and after that term expired (January 12, 2017), TJX had the right to renew according to the same terms and conditions for an additional one-year period by providing written notice to Event Sales prior to the expiration of the initial term. Salvage Agreement § 10.1. The parties executed an amendment to the Salvage Agreement in

---

[2] In support of its partial motion for summary judgment on its counterclaim, FedEx seeks to recover unpaid shipping costs incurred by Event Sales between December 2022 and June 12, 2023 totaling $6,291,636.39. The motion is one for partial summary judgment because FedEx claims that Event Sales has a balance of $7,195,841.71 in unpaid shipping costs. At the hearing on the motion for summary judgment, FedEx's counsel indicated that if its motion for partial summary judgment is granted, in the interests of judicial efficiency and preservation of court resources, FedEx will forego further attempts to litigate its claim regarding the remaining $904,205.32 in unpaid shipping costs.

[3] In the process of retaining the TJX business prior to the effective date of the Salvage Agreement, Event Sales submitted a bid that identified certain sizes of boxes that it contemplated. Kletscher Aff. (Doc. 73), Ex. 6.

2023 with an effective date of March 30, 2023 (the "2023 Amendment"). Kappelman Decl., Ex. 3. The 2023 Amendment renewed all the terms of the Salvage Agreement, and provided that the Salvage Agreement would continue through March 30, 2024. The 2023 Amendment also gave TJX the right to renew the Salvage Agreement for additional one-year periods by providing notice 60 days before the previous term expired. *Id.* The parties did business continuously between the original execution of the Salvage Agreement in 2015 and the execution of the 2023 Amendment.

Under the Salvage Agreement, Event Sales agreed to purchase merchandise from TJX "for the purpose of resale by [Event Sales] in a manner that will not adversely affect TJX's business in the sale of merchandise to the general public." Salvage Agreement § 1.1. Thus, Event Sales agreed that "[a]ll Merchandise sold by [Event Sales] to third parties shall be sold exclusively for export to countries outside of North America and Europe. . . ." *Id.* § 3.1. The contract further provides that "TJX provides no warranty or guaranty, whether express or implied, as to the quality of the Merchandise presented to [Event Sales] for sale, and [Event Sales] acknowledges and agrees that all Merchandise sold under this Agreement is sold 'as-is', and on a no-return, final sale basis." *Id.* § 7.4. In addition, the Salvage Agreement states that "[n]either party shall be liable for punitive, exemplary, special, consequential or incidental

damages, whether or not the possibility of such damages has been disclosed to such party in advance or could have been reasonably foreseen by such party." *Id.* § 7.1.[4]

The Salvage Agreement contains a choice of law provision, as well as merger and integration, non-waiver, and no-oral-modifications clauses. These provisions read as follows:

> 11.11.    This Agreement constitutes the entire agreement between the parties relating to the subject matter of this Agreement and supersedes any prior agreements. Any modification or waiver of any provision must be made in writing and signed by an authorized representative of both parties. Failure of either party at any time to enforce any of the provisions of this Agreement shall not be deemed to be a waiver of such or any other provision.
>
> 11.12.    The laws of the Commonwealth of Massachusetts (without giving effect to its conflicts of law principles) govern all matters arising out of or relating to this Agreement and all of the transactions it contemplates, including without limitation, its interpretation, construction, performance and enforcement.

*Id.* §§ 11.11–11.12.

The Salvage Agreement also establishes a pricing schedule that depends upon the location of the merchandise and the method of delivery. *Id.*, Schedule A. For salvage merchandise from T.J. Maxx and Marshalls stores, Event Sales agreed to pay $25.50 per carton,

---

[4] Section 5 of the Salvage Agreement imposes confidentiality obligations on Event Sales and TJX, and TJX has asserted a counterclaim against Event Sales for violation of this provision. Although TJX does not argue that it is entitled to summary judgment on its confidentiality counterclaim and the specific terms of the confidentiality provision are largely unimplicated by this decision, Event Sales points out that there is a typographical error in a cross-reference to the confidentiality provision in Section 7 (Limitation of Liability) of the agreement. Two subparts of Section 7 of the Salvage Agreement mistakenly cross-reference subparts of Section 6, but should make reference to Section 7. In addition, Section 7 mistakenly indicates that the confidentiality provisions of the agreement are found in Section 4, when they are, in fact, found in Section 5. Event Sales raises these issues in support of its arguments that the Salvage Agreement's limitation on consequential and incidental damages do not bar portions of the financial recovery it seeks for TJX's alleged breach of contract.

and $10 per carton from HomeGoods stores. Each store would ship cartons to Event Sales. *Id.*
The Salvage Agreement does not specify the volume of merchandise Event Sales agreed to
purchase, but in Schedule A, TJX reserved the right to negotiate the price of merchandise sold to
Event Sales "under special situations," including where the "quantity or quality of merchandise
is different from ordinary course." *Id.*

The Salvage Agreement requires Event Sales to provide "Reporting" according to the
terms of "Schedule B," which is also attached to the contract. Salvage Agreement § 4.1; *id.*,
Schedule B. On or around the 12th of each month, Event Sales agreed to provide TJX a report on
the boxes received from TJX stores that would "reflect the previous months box receipts." *Id.*,
Schedule B. "This report will show the total number of boxes received using the PRP labels and
it will also show [TJX] the total number of boxes received without using a PRP label." *Id.* Event
Sales agreed to "provide a reconciliation settlement report showing the total amount due to
TJX." *Id.* And Event Sales agreed to pay all invoices from TJX "net 60 days from the last day of
each month." *Id.*

The Salvage Agreement does not discuss shipping terms in detail, nor does it specify who
would pay for shipping. However, it is not entirely silent on the subject. The contract's reference
to "PRP labels" in Schedule B reflects the reality that Event Sales and TJX used FedEx to ship
cartons of merchandise from TJX stores to Event Sales. *See id.*, Schedule B (noting that the
timing of the monthly report would depend on the availability of information obtained from
FedEx).

Event Sales chose to use FedEx's Package Returns Program ("PRP") to have
merchandise shipped from TJX stores. Kappelman Decl., Ex. 30, Peterson Dep. 168:6–9. Event
Sales' relationship with FedEx was governed by a Transportation Services Agreement, which

6

was amended in February 2021 and 2023. FedEx Ex. B (Transp. Servs. Agreement); FedEx Ex. K; FedEx Ex. A, Peterson Dep. 162:1–3; FedEx Ex. D, Roehl Dep. 119:8–12. Event Sales sent PRP labels to TJX's supply center, which then distributed the labels to TJX stores around the United States. Roehl Dep. 31:21–32:10. Event Sales ordered the PRP labels from FedEx in large quantities. Kletscher Aff., Ex. 57, Roehl Dep. 21:14–20; Kappelman Decl., Ex. 1 Roehl Dep. 49:24–50:2; Peterson Dep. 30:2–14. The PRP labels did not have a "sticker price," meaning that Event Sales did not pay for the labels up front. FedEx only charged Event Sales for a PRP label once the label was used to ship a carton from a TJX store to Event Sales. FedEx determined the ultimate cost of shipping based on the size of the package, where it was being delivered, and other details. Roehl Dep. 48:24–49:10.

When TJX stores received the PRP labels from Event Sales, their staff attached them to cartons loaded with salvage merchandise, then contacted FedEx to schedule the pickup. Kappelman Decl., Ex. 23 (TJX Salvage Policy and Procedure) TJX00001300–1301; Kletscher Aff., Ex. 7 (Event Sales Salvage Program Instructions). FedEx would then pick up the packages from a TJX store, deliver them to Event Sales' distribution center in Minneapolis, and invoice Event Sales for the shipments. Roehl Dep. 21:11–20, 31:21–22, 46:16–20; Compl. ¶ 2.9. Once it received the boxes of salvage merchandise, Event Sales would resell the goods to its own customers.

## II.    TJX's Alleged Contractual Breaches

Event Sales alleges that TJX breached the Salvage Agreement in several ways over the course of their relationship, including (1) shipping "garbage" and packaging items poorly so that Event Sales could not resell the goods to its customers; (2) drastically increasing the volume of merchandise sent to Event Sales, causing it to incur substantial additional handling costs;

(3) increasing the amount of seasonal merchandise in the shipments, which Event Sales'
customers did not want; and (4) using boxes that were too large, causing Event Sales to incur
substantially greater costs from FedEx. The Court turns to the evidence submitted by the parties
on these issues.

Event Sales provided TJX with instructions concerning the salvage program that would
help Event Sales minimize "freight and labor costs." Kletscher Aff., Ex. 7. The instructions
indicated that the cartons should have dimensions close to 24" x 16" x 17" and that Event Sales
"would rather have [TJX] ship several boxes close to this size than extremely large boxes as that
increases the freight costs for the box." *Id.* The instructions also stated that anything glass,
ceramic, or fragile should be wrapped securely in bubble wrap or paper to prevent breaking. *Id.*
Event Sales instructed TJX not to "ship items that cannot be repaired," noting that it had "been
receiving many items that we need to discard." *Id.* ("Please only ship items that can be repaired
for resale."). A TJX slide presentation prepared in connection with Event Sales' initial bid to
renew the salvage business in 2015 also reflects that the "recommended carton size" for the
salvage program should be 24" x 20" x 12" and 24" x 16" x 12". Kletscher Aff., Ex. 27 at 5.

In 2019, TJX's Marshalls and TJ Maxx stores adopted guidelines for employees to follow
when handling salvage merchandise and for shipments to Event Sales. Kletscher Aff., Ex. 8. The
policy provides that each shipment should be comprised of at least five cartons, that the stores
sending out salvage or "MOOS" merchandise[5] should use "Fragile" cartons or boxes of
comparable size,[6] and that "[a]ll merchandise, which has been marked out-of-stock and has a

---

[5] In their evidentiary submissions and in the briefing, the parties also refer to salvage
merchandise as "MOOS" merchandise, an acronym for marked-out-of-stock.

[6] The so-called "Fragile" cartons have similar dimensions to the box sizes Event Sales requested
TJX to use in shipping the goods.

resale value, including customer returns of slightly worn merchandise, damages, mismates, etc. will be sent to [Event Sales]." *Id.* Under the policy, "[g]iftware/glassware items considered to be unsalable [by TJ Maxx and Marshalls] because of chips, dents, etc." could be included in shipments to Event Sales "only if it is determined that further damage will not occur while in transit." *Id.* Further, the policy explains that TJX would not send Event Sales "[d]amp, wet, mildewed or hazardous merchandise," or "[m]erchandise with no intrinsic resale value." *Id.*

Over the years the volume of merchandise TJX sold to Event Sales increased. In 2014, the year before the parties executed the 2015 Salvage Agreement, TJX shipped 28,142 cartons to Event Sales. Kletscher Aff., Ex. 49 at 10. In 2015, Event Sales received a similar volume: 28,712 cartons. *Id.* In the following years, the volume mostly increased: in 2016, 37,645 cartons; in 2017, 42,432 cartons; in 2018, 57,387 cartons; in 2019, 85,309 cartons; in 2020, 105,129 cartons; and in 2021, 88,170 cartons. *Id.* But the increase was even more dramatic in 2022 and early 2023. Between August 2022 and December 2022 alone, Event Sales received 125,455 cartons. *Id.* In January 2023, Event Sales received 40,704 cartons from TJX, and another 57,327 cartons in February 2023. *Id.*, Ex. 5.

One of Event Sales' concerns that arose during the parties' relationship is the volume of seasonal or holiday merchandise that it received from TJX, particularly Easter and Christmas merchandise. Kletscher Aff., Ex. 49 at 8–9. In or around 2017, the mix of merchandise in the TJX salvage cartons "changed and began to include a very large amount of holiday merchandise." *Id.* at 9. Many of Event Sales' customers are located outside of the United States and have no interest in American holiday merchandise. Roehl Dep. 65:24–66:2. Around 2017, one such customer complained about the amount of holiday merchandise Event Sales was sending to it. Kletscher Aff., Ex. 49 at 9. Event Sales had been simply forwarding the packed

cartons to its customer without sorting or removing the holiday merchandise. *Id.* When the customer complained, Event Sales had to begin sorting the merchandise it received from TJX into categories for resale, and to do so, it hired a third party to provide the sorting labor. *Id.*; Roehl Dep. 21:21–24:22, 35:1–15. In the meantime, Event Sales also had to store the holiday merchandise until it could find a suitable buyer, resulting in most holiday merchandise being resold at a loss. Roehl Dep. 65:24–66:2. This increased Event Sales' labor and storage costs significantly, making the salvage business with TJX less profitable.

Event Sales also claims that TJX used the salvage merchandise program as a means of off-loading its refuse so that it could represent to the public that it was not contributing to landfills, sticking Event Sales with garbage that it couldn't resell to its customers. In April 2022, TJX introduced environmental sustainability goals, including efforts to reduce and recycle packaging used to transport goods, decrease TJX's reliance on single-use plastics, and expand programs for merchandise recovery and reuse. Kletscher Aff., Ex. 23 at 1. TJX also sought to "divert 85% of its operational waste from landfill[s] by 2027." *Id.*, Ex. 23 at 2. This sustainability focus coincided with the significant increase in volume of merchandise shipped to Event Sales in the second half of 2022.

Then, in December 2022, TJX learned of a viral video posted on YouTube, which showed a woman who reported that she found several bags of Halloween merchandise in a dumpster behind a TJX store. Kletscher Aff., Ex. 28; Zepf Dep. 13:21–14:4; Putney Dep. 29:11–30:19. The implication that TJX had simply thrown usable merchandise in a dumpster did not align with the focus on environmentally sustainable business practices. In response to the video, TJX's communications team sent a message to its store personnel. The message clarified that TJX employees should ship any MOOS merchandise to Event Sales, provided it was not

hazardous waste, did not present a safety issue, and that a manufacturer did not otherwise

prevent TJX from reselling. Kletscher Aff., Ex. 29 at 6 ("At no time should MOOS merchandise

be placed in store compactors/dumpsters if merchandise meets Salvage criteria and can be

shipped to Event Sales or if Hazardous Waste.").

Also in December 2022, HomeGoods stores adopted a Salvage Policy and Procedure that

indicates the "program consists of shipping damaged and defective merchandise that is no longer

saleable to the salvage company." Kletscher Aff., Ex. 9 at TJX00001299. It further explains that

"[d]amaged and defective merchandise that is non-saleable are items that do not have value to a

Customer." *Id.* The policy indicates that salvage merchandise can include "[f]ood that was

marked out during the sub cycle"; "[p]urged clearance merchandise"; and "[r]eturned, damaged

items." *Id.* It also lists examples of items not for salvage, such as: "[i]tems with no resale value

such as broken mirrors, opened food items, crushed items, broken glass, and other merchandise

considered non-repairable/usable"; recalls; expired food; damp/wet, mildewed merchandise;

items that could be harmful or cause injury; and items that are too large to fit into designated box

sizes (such as furniture). *Id.* Elsewhere, the HomeGoods policy defined "non-saleable" or "un-

saleable" merchandise as merchandise that should be sent to salvage or destroyed at the store

level and that is "severely damaged, distressed, or considered unsafe and does not fit" into four

other markdown categories. *Id.* at TJX00001303. But the document also suggests that TJX stores

should begin using larger boxes with the capacity of approximately six cubic feet. *Id.* at

TJX00001300. It instructs store personnel to use boxes of a size where the length, width, and

height measurements would total between 64 and 70 inches. *Id.*[7]

---

[7] For comparison, the box sizes that Event Sales preferred, and that early documentation reflects
are somewhat smaller than the HomeGoods 64–70" total-measurement guidelines: 24" x 16" x
17" (57"); 24" x 20" x 12" (56"); and 24" x 16" x 12" (52").

Around this time, Event Sales communicated to TJX that the larger boxes it had received from HomeGoods were causing it to incur substantial increases in shipping costs. Kletscher Aff., Ex. 24. For example, Event Sales explained that it had incurred close to $30,000 in a single month in oversized charges based on the size of the boxes TJX was using, and Event Sales requested that the smaller "fragile" sized boxes be used. *Id.* Event Sales later informed TJX that it had incurred oversized charges in November 2022 of $120,000. *Id.* According to Event Sales, TJX sent boxes during this period that were larger than those reflected in the parties' original salvage policies more than 75% of the time. Kletscher Aff., Ex. 3. FedEx acknowledged that the use of larger boxes by TJX contributed significantly to Event Sales incurring increased costs. Kletscher Aff., Ex. 40 at ESI2476.

Event Sales also noted an increase in the total amount of salvage merchandise it was receiving after the post-Halloween viral video was released. Event Sales received over 40,000 cartons in January 2023 and more than 57,000 cartons in February 2023. Kletscher Aff. Ex. 5; *id.*, Ex. 49 at 10. According to Event Sales, much of the increase comprised seasonal or holiday merchandise. Kletscher Aff., Ex. 5 (chart indicating numbers of cartons of holiday merchandise received from each TJX banner). A few months later, TJX acknowledged that Event Sales received "a significant growth in units from [TJX]." Kletscher Aff., Ex. 32. TJX also documented increased revenue associated with the salvage program, and a slide presentation comparing volume between fiscal years 2022 and 2023 indicates increased holiday units were tied to increased salvage revenue. *Id.* at 4–5. Meanwhile, over the course of one week in February 2023, Event Sales incurred close to $1 million in shipping costs with FedEx because of the increased volume of TJX shipments. Pittman Dep. 40:11–22.

Event Sales also says that TJX began haphazardly packing the merchandise in boxes, causing damage in transit. According to Event Sales, many boxes were shipped before they had been packed full of merchandise. Kletscher Aff., Ex. 3 at TJX00010379. TJX employees also packed items in boxes without any protective material and boxes arrived at Event Sales' locations with broken and shattered glass. *Id.* Cartons arrived that were poorly packed and heavily damaged. Kletscher Aff., Ex. 43. Event Sales also found that TJX packed "[i]tems with obvious previous damage that should not have been shipped in the first place" because they could not be used for resale and "[i]tems with heavily damaged packaging and missing product within the retail package." Kletscher Aff., Ex. 3 at TJX00010379. And according to Event Sales, TJX shipped "literal garbage"[8] to it, including: broken items that could not be repaired; paper napkins and plates out of the packaging; heavily used clothing with signs of previous soiling and heavy damage; heavily used single shoes and slippers; used bedding; heavily used pillows; heavily used toys out of their boxes and missing pieces; expired human and pet food; damaged bottles of liquid; broken picture frames; and old store use items such as plastic bags, display items, and store decorations. Kletscher Aff., Ex. 49 at 22–23.

Notably, Event Sales considered many of the cartons it received to constitute "total loss" cartons when it provided monthly reconciliation reports to TJX. Roehl Dep. 42:10–43:9, 80:3–18. As early as February 2019, Event Sales began taking credits for both the product and shipping costs for such "total loss" boxes. Roehl Dep. 71:8–72:5. Without auditing or disputing Event Sales' reconciliation reports, TJX honored the deductions and credited the total loss cartons against the monthly balance it charged Event Sales for salvage merchandise. Roehl Dep. 72:8–10.

---

[8] Pl.'s Opp'n to TJX Mot. at 10, Doc. 71.

### III.    TJX Finds a New Salvage Vendor

In December 2022, Event Sales stopped sending reconciliation reports to TJX and withheld payment for salvage merchandise that it received. Kappelman Decl., Ex. 44; *id.*, Ex. 42 (Event Sales 30(b)(6) Dep. 31:21–32:12); *id.*, Ex. 43. That same month, beginning on December 20, 2022, Event Sales stopped making payments on its FedEx invoices. Jakus Dep. 90:16–25. Despite the nonpayment, for several months TJX continued to ship salvage merchandise to Event Sales using the PRP labels, and FedEx continued delivering the packages.

In the months between December 2022 and September 2023, Event Sales communicated with TJX about the problems that it had encountered with TJX's shipments of seasonal merchandise, increased volume, packaging concerns, carton sizes, and other issues. *E.g.*, Kletscher Aff., Ex. 10. Event Sales asked TJX to assist it in paying its growing debt to FedEx. *Id.* In April 2023, Event Sales informed TJX that it could not accept Easter merchandise, and the businesses attempted to work around Event Sales' concerns by having TJX provide the shipments using its own FedEx account. Kletscher Aff., Ex. 30; Putney Dep. 78:1–79:8. Meanwhile, FedEx indicated to Event Sales that because of its past-due bills, its FedEx account was at risk of being suspended. Kletscher Aff., Ex. 62. Event Sales continued to request that TJX assist it in paying its growing FedEx bills. TJX began looking for a new vendor in April 2023. Putney Dep. 6:12–61:9.

During this period, internally at TJX, Courtney Zepf, a Category Manager in Global Sourcing & Procurement who worked on the Event Sales business, expressed concerns about how TJX was handling its relationship with Event Sales and its request for a contribution to pay down the debt to FedEx. *E.g.*, Kletscher Aff., Exs. 10, 12, 16, 21. In mid-July, internal TJX emails indicate that the company leadership was generally in agreement that TJX had abided by

the terms of the parties' contract and that TJX should not provide a "bail out" payment to Event Sales. *Id.*, Ex. 34. However, some TJX executives expressed concern that sharing that information immediately with Event Sales would leave TJX stores without a salvage vendor, creating disruptions for its business. *Id.*, Ex. 35; *id.*, Ex. 25. Event Sales continued asking TJX for an answer about its request for payment assistance with FedEx bills during June and July. *Id.*, Exs. 13–16. Ms. Zepf expressed concern about not responding to Event Sales' requests and eventually told Sheree Roehl in late July that TJX was continuing to discuss the matter internally. *Id.*, Exs. 16–17.

TJX eventually instructed its stores to stop sending MOOS merchandise to Event Sales and to destroy remaining PRP labels on August 10, 2023. Kappelman Decl., Ex. 26. On August 28, 2023, Event Sales asked TJX if it was any closer to a solution because Event Sales had started to receive collections calls and threats of litigation from FedEx. Kletscher Aff., Ex. 22. On September 14, 2023, TJX informed its stores that it had retained a new salvage vendor. Kappelman Decl., Ex. 60. And TJX officially informed Event Sales that it was no longer going to send it salvage merchandise on a videoconference call on September 15, 2023. Kletscher Aff., Ex. 64; Roehl Dep. 146:25–147:2.

## DISCUSSION

### I. Legal Standards

#### A. Summary Judgment

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Cearley v. Bobst Gr. N. Am. Inc.*, 129 F.4th 1066, 1069 (8th Cir. 2025). The moving party must demonstrate that the material facts are undisputed.

*Celotex*, 477 U.S. at 322. A fact is "material" only if its resolution could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Lankford v. City of Plumerville, Ark.*, 42 F.4th 918, 921 (8th Cir. 2022). When the moving party properly supports a motion for summary judgment, the party opposing summary judgment may not rest on mere allegations or denials, but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256; *McGowen, Hurst, Clark & Smith, P.C. v. Com. Bank*, 11 F.4th 702, 710 (8th Cir. 2021). A dispute of fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Courts must view the inferences to be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Becker v. City of Hillsboro, Mo.*, 125 F.4th 844, 851 (8th Cir. 2025). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . ." *Nunn v. Noodles & Co.*, 674 F.3d 910, 914 (8th Cir. 2012) (quoting *Anderson*, 477 U.S. at 255).

**B.  Exclusion of Expert Evidence**

The decision whether to admit expert testimony is a matter left to the district court's discretion. *See Kuhn v. Wyeth*, 686 F.3d 618, 624 (8th Cir. 2012). The proponent of expert testimony has the burden to show it is admissible by a preponderance of the evidence. *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 9 F.4th 768, 776–77 (8th Cir. 2021). Federal Rules of Evidence 702 and 703 govern such evidence's admissibility. Under Rule 702, there are three requirements for evidence to be admitted: (1) evidence based on scientific, technical, or specialized knowledge must be useful to the finder of fact, which is to say it must be

16

relevant; (2) the witness offering the evidence must be qualified; and (3) the evidence must be reliable. *See Johnson v. Mead Johnson & Co.*, 754 F.3d 557, 562 (8th Cir. 2014) (citing *Polski v. Quigley Corp.*, 538 F.3d 836, 839 (8th Cir. 2009)).

"The standard for judging the evidentiary reliability of expert evidence is lower than the merits standard of correctness[, and the] reliability inquiry is a flexible one with many factors bearing on it." *In re Bair Hugger*, 9 F.4th at 777 (cleaned up). Courts considering whether expert evidence is sufficiently reliable consider the following four non-exclusive factors: "(1) whether the expert's theory or technique can be or has been tested, (2) whether the theory or technique has been subjected to peer review or publication, (3) the known or potential rate of error of the theory or technique, and (4) whether the technique or theory is generally accepted." *Id.*

## I.    FedEx's Motion for Summary Judgment

FedEx argues that Plaintiff cannot prevail on its claim for a declaratory judgment that it is not liable to pay contractual damages to FedEx. In addition, FedEx contends that it is entitled to summary judgment on its own beach-of-contract counterclaim against Event Sales for failure to pay the shipping costs it incurred between December 2022 and June 12, 2023. Because the Court finds there is no genuine dispute that, without legal excuse, Event Sales failed to pay the amounts it owed for shipping costs from December 2022 and June 12, 2023, FedEx's motion for summary judgment is granted.

Under Minnesota law,[9] the party asserting a breach-of-contract claim must prove (1) the existence of a valid contract between the parties; (2) that it performed any conditions precedent to demanding performance by the other party; (3) a material breach of the agreement by the other

---

[9] FedEx relies on Minnesota law in its motion, and Event Sales does not argue for the application of the substantive law of any state other than Minnesota in their diversity dispute.

party; and (4) damages. *Nelson v. Am. Fam. Mut. Ins. Co.*, 899 F.3d 475, 480 (8th Cir. 2018);

*Fairview Health Servs. v. Armed Forces Office of Royal Embassy of Saudi Arabia*, 753 F. Supp.

3d 733, 750 (D. Minn. 2024). A party breaches a contract when it fails, "without legal excuse, to

perform any promise that forms the whole or part of the contract." *Lyon Fin. Servs., Inc. v.*

*Illinois Paper and Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014). The party asserting a claim

of breach of contract must prove damages caused by the breach. *D.H. Blattner & Sons, Inc. v.*

*Firemen's Ins. Co. of Newark, N.J.*, 535 N.W.2d 671, 675 (Minn. Ct. App. 1995).

The following material facts are not in dispute. Event Sales and FedEx had a valid

contract—the "Transportation Services Agreement"—that was amended in February 18, 2021

and again in February 17, 2023. That agreement governed the parties' shipping relationship for

TJX packages during the period between December 2022 and June 12, 2023. Under the parties'

contract, Event Sales used FedEx's "package return program" or "PRP" label system to facilitate

shipments of TJX's salvage merchandise to Event Sales locations in Minnesota. Event Sales

provided pre-printed shipping labels to TJX for TJX employees to use when packaging and

shipping goods to Event Sales. TJX loaded cartons with TJX merchandise, then TJX affixed a

PRP label to the carton, and FedEx picked up the cartons from TJX stores for delivery to Event

Sales. Following delivery, FedEx sent invoices to Event Sales for the shipping costs incurred

using the PRP labels.

There is similarly no dispute that Event Sales regularly paid all the invoices FedEx sent

until December 20, 2022, but stopped paying anything after that date. Meanwhile, between

December 2022 and June 12, 2023, TJX continued to affix PRP labels to cartons, which FedEx

continued to deliver to Event Sales per the parties' agreement. Event Sales never asked FedEx to

stop delivering packages with the pre-printed shipping labels from TJX. This continued until

FedEx suspended Event Sales' account. Between December 2022 and June 12, 2023, Event Sales incurred shipping costs pursuant to the parties' contract of $6,291,636.39.

Given these undisputed facts, there is nothing for a jury to decide with respect to FedEx's breach-of-contract counterclaim. Event Sales and FedEx entered a valid contract, and Event Sales breached the contract by failing to pay FedEx for the deliveries of TJX cartons that FedEx provided between December 20, 2022 and June 12, 2023. There is no question that FedEx performed any conditions precedent to being entitled to payment from Event Sales. And FedEx was damaged by Event Sales' breach in the amount of just over $6.29 million in unpaid invoices. Thus, FedEx is entitled to judgment on its breach-of-contract claim against Event Sales in the amount of $6,291,636.39.

Event Sales does not argue that FedEx failed to show the existence of the contract, nor does it point to evidence indicating that FedEx failed to perform. Nor does Event Sales dispute that it failed to fulfill its payment obligations under the contract. Instead, Event Sales argues that there is evidence showing the parties agreed it would be entitled to certain discounts on the shipments at issue, and it contends that FedEx's evidence does not show whether those discounts were applied. According to Event Sales, the parties negotiated discounted rates for FedEx's dimensional weight surcharge ("DIM Surcharge"), a general discount on all cartons, and 50% discounted handling surcharges (the "AHS DIM Surcharge" and "AJS Handling Surcharge"). Because those discounts are not clearly reflected in FedEx's evidence of the balance due for shipping charges, Event Sales argues that a jury should decide whether those discounts should have been applied to the relevant shipments between December 2022 and June 2023. FedEx

disagrees that this argument requires a trial for two reasons, one procedural[10] and the other on the merits. FedEx Reply at 5–8, Doc. 76. The Court turns directly to the merits of this unapplied-discounts theory.

### Unapplied Discounts

A reasonable jury could not find in Event Sales' favor on this unapplied-discounts argument. The Transportation Services Agreement incorporates the FedEx Services Guides by reference, and under these Guides, Event Sales was required to submit any request for adjustment of an invoice premised upon an "overcharge" within 60 days after the relevant shipment. The Guides also required Event Sales to present any overcharge-adjustment request to FedEx in certain specified ways. Event Sales presents no evidence that it complied with those contractual requirements for the timing and manner of requesting adjustment of invoices based on an overcharge.

The Transportation Services Agreement explicitly incorporates the FedEx Services Guides by reference. It plainly states that "[e]ach shipment made with FedEx is subject to the terms and conditions of the FedEx Service Guide in effect at the time of shipment, which terms are incorporated in this Agreement by reference." FedEx Ex. B at 1, Doc. 55. This incorporation by reference makes the Guides part of the parties agreement. "[A] writing incorporates another

---

[10] As an initial matter, FedEx argues that Event Sales' assertion that FedEx failed to apply contractually mandated discounts is procedurally improper because Event Sales introduced this theory for the first time in opposition to the motion for summary judgment. FedEx is correct that courts sometimes refuse to consider theories of a claim that were not alleged in a complaint and were argued for the first time in opposition to summary judgment. *E.g.*, *Kieland v. Rocky Mtn. Choc. Factory Inc.*, No. 05-cv-150 (DWF/SRN), 2006 WL 2990336, at *11 n.2 (D. Minn. Oct. 18, 2006) (declining to consider theories of Minnesota Franchise Act discrimination claims that were presented by the plaintiffs for the first time in response to a motion for summary judgment because "Plaintiffs never pleaded this allegation in their Complaint"). Here, however, the Court need not rely on this forfeiture rule because Event Sales' unapplied-discounts theory fails on its merits.

document when the terms of the incorporated document are known or readily available to the parties, even if the incorporated document was not provided with the writing." *Nielsen v. Grain Millers, Inc.*, No. 16-cv-3103 (WMW/TNL), 2017 WL 11569190, at *4 (D. Minn. May 2, 2017) (citing *Halbach v. Great-West Life & Annuity Ins. Co.*, 561 F.3d 872, 876 (8th Cir. 2009); *Datalink Corp. v. Perkins Eastman Architects, P.C.*, No. 13-cv-2978, 2015 WL 3607784, at *4 (D. Minn. June 8, 2015); *Johnson v. Piper Jaffray, Inc.*, 530 N.W.2d 790, 796 (Minn. 1995)). Because the FedEx Service Guides were effectively incorporated in the Transportation Services Agreement, the shipments from TJX to Event Sales using the PRP labels from December 2022 and June 12, 2023 are governed by any applicable terms of the Guides.

Under both the 2022 and 2023 FedEx Service Guides, Event Sales was required to raise any disputes with the amount it was charged[11] for a particular shipment through a "[r]equest[] for invoice adjustment." FedEx Ex. N p. 125, § N ¶¶ 4, 7, Doc. 78-1; FedEx Ex. O p. 124, § N ¶¶ 4, 7, Doc. 78-2. The Guides require such requests to be "received within 60 days after the original invoice date []or ship date if prepaid. . . ." *E.g.*, FedEx Ex. N p. 125, § N ¶ 4. The requested invoice adjustment could be submitted in one of five different ways, and "partial payment against an invoice is not considered a request for invoice adjustment or notice of a refund request." *Id.* at p.125, § N ¶ 7(a)–(e). Further, the Guides state that FedEx "will not be liable for any invoice adjustment unless you comply with the notice requirements described above." *Id.* at p. 125, § N ¶ 8.

---

[11] This portion of the 2022 and 2023 Service Guides specifically refers to requests for invoice adjustments "due to an overcharge." The Guides define an "overcharge" as "a charge based on an incorrect rate; an incorrect special handling fee; . . . billing based on incorrect package or shipment weight; . . . or any other billing, unrelated to a service failure, that results in an incorrect charge." *E.g.*, FedEx Ex. N, p. 122 (Definitions: "overcharge"). This definition of overcharge plainly applies to the discounts Event Sales claims it was entitled to receive.

Event Sales does not point to any evidence showing that it submitted any requests for invoice adjustments, let alone that it did so for any of the invoices between December 20, 2022 and June 13, 2023 where it asserts FedEx failed to properly apply contractually mandated discounts. This means that Event Sales has not identified a genuine factual dispute for a jury to decide. There is no evidence from which a reasonable jury could conclude that Event Sales made adjustment requests within the time or in the manner required by the Guides. There is also no evidence suggesting that Event Sales even tried to raise such disputes in technically non-compliant ways. The plain language of the contract forecloses FedEx's liability for invoice adjustments in the absence of notice conforming to the Guides. Rather than providing notice in conformance with the contract, Event Sales seeks to raise the issue of its eligibility for certain discounts through this litigation, but that too is forbidden by the parties' agreement. *Id.* at p. 125, § N ¶ 8 ("The filing of a lawsuit against [FedEx] does not constitute compliance with these notice provisions."). Having a jury trial to resolve the question of unapplied discounts is, therefore, unnecessary.

For the reasons discussed above, the Court finds that FedEx is entitled to partial summary judgment on its breach-of-contract counterclaim against Event Sales in the amount of $6,291,636.39. FedEx is also entitled to summary judgment to the extent that Event Sales seeks a declaratory judgment that it does not owe those sums to FedEx.

## II.  TJX's Motion

TJX moves for summary judgment on each of the claims Event Sales asserts against it in the Complaint as well as on its own breach-of-contract counterclaim. For the reasons that follow, TJX's motion is granted. Having reached that conclusion, the Court finds it unnecessary to consider whether testimony from Plaintiff's damages expert should be excluded.

### A. Plaintiff's Claims

#### 1. Breach of Contract

Section 11.12 of the Salvage Agreement provides that the contract is governed by Massachusetts law, and the parties agree that the Court should apply Massachusetts law to Event Sales' breach-of-contract claim against TJX. "Minnesota courts generally recognize" and "enforce" a choice-of-law clause agreed upon by the parties. *Superior Edge, Inc. v. Monsanto Co.*, 964 F. Supp. 2d 1017, 1031 (D. Minn. 2013) (quoting *Fla. State Bd. of Admin. v. Law Eng'g & Envtl. Servs., Inc.*, 262 F. Supp. 2d 1004, 1012 (D. Minn. 2003)). For a plaintiff to prevail on a breach-of-contract claim under Massachusetts law, the plaintiff must establish the following elements:

> 1) there was an agreement between the parties, 2) the agreement was supported by consideration, 3) the plaintiff was ready, willing, and able to perform his or her part of the contract, 4) the defendant committed a breach of the contract and 5) the plaintiff suffered harm as a result.

*Thermal Eng'g Int'l (USA) Inc. v. Lanaville*, 646 F. Supp. 3d 202, 205 (D. Mass. 2022) (citing *Bulwer v. Mount Auburn Hosp.*, 46 N.E.3d 24, 39 (Mass. 2016)); *Huang v. RE/MAX Leading Edge*, 190 N.E.3d 150, 153–54 (Mass. Ct. App. 2022) (same), *aff'd* 201 N.E.2d 713 (Mass. 2023).

TJX argues that it is entitled to summary judgment on Event Sales' contract claim because there is no evidence showing that TJX breached any requirement imposed by the Salvage Agreement. TJX also contends that the Salvage Agreement's clause excluding recovery of incidental and consequential damages means that Event Sales cannot recover most of the damages it seeks. And TJX asserts that Event Sales cannot demonstrate or quantify its damages, and its damages expert's opinions should be excluded. Event Sales disagrees, claiming that TJX

breached the Salvage Agreement in four ways: (1) shipping merchandise to Event Sales that could not be resold; (2) packing merchandise into large boxes or cartons, causing increased shipping costs; (3) increasing the volume of shipments, leading to excessive labor and handling costs; and (4) sending it seasonal merchandise that TJX could not easily resell, leading to additional labor and handling expenses.

### *Non-Resaleable Merchandise*

Start with the parties' dispute over whether the Salvage Agreement required TJX to send Event Sales merchandise that Event Sales could resell to its own customers. TJX argues that it cannot be liable for this alleged breach because Section 7.4 of the Salvage Agreement provides that all merchandise is sold "as is" with no warranty or guarantee regarding the nature of the goods. Event Sales suggests that, at a minimum, the contract is ambiguous as to whether TJX was required to ship it materials that could be resold to Event Sales' customers, and a jury should decide what the intent of the parties was based on all the evidence. For example, Event Sales notes that Section 1.1 of the contract states that Event Sales agrees to purchase merchandise from TJX "for the purpose of resale." Event Sales also argues that the contract term "merchandise" is ambiguous and a reasonable jury could determine that Event Sales did not intend to purchase non-resaleable material from TJX.

While the "as is" and "no warranty" language of Section 7.4 provides some support for TJX's position, reading the contract as a whole does not definitively undermine Event Sales' argument that the merchandise had to be resaleable. In addition to that liability-limiting language in Section 7.4, the contract also straightforwardly indicates Event Sales is purchasing salvage goods *for the purpose of resale*. This makes it difficult to conclude, as a matter of law, that because Event Sales agreed to purchase merchandise "as is," the parties' mutually intended that

24

TJX could send it virtually anything, such as garbage, and Event Sales would have no recourse under the agreement. The logical extension of the construction that TJX gives to the language of Section 7.4 is that TJX would be entitled to payment at the contract price even if it simply dumped merchandise that had become completely unusable or trash into a carton, affixed a PRP label to the box, and shipped it to Event Sales. A more plausible interpretation of the contract is that TJX was obligated to send Event Sales merchandise that had some possibility of being capable of resale. However, the Court concludes that it is unnecessary to engage in further construction of the agreement on this issue.

The problem for Event Sales concerns its damages. The evidence shows that Event Sales has already been made whole for the purchase price it was obligated to pay when it was shipped goods that it unilaterally determined could not be resold. There is no dispute that, beginning in 2019, Event Sales began taking credits for both purchase and shipping costs whenever it deemed cartons received from TJX to be a "total loss." There is similarly no dispute that whenever Event Sales designated a carton a "total loss" on its monthly reconciliation reports, TJX credited those total-loss boxes against the balance Event Sales would otherwise have been required to pay under Schedule A of the Salvage Agreement. In other words, Event Sales had the opportunity to request reimbursement for both the shipping and purchase costs of boxes it considered non-resaleable and took advantage of that opportunity regularly when preparing monthly reconciliation reports. When it did so, TJX allowed Event Sales to take such credits without conducting an audit or otherwise second-guessing Event Sales' self-help remedies. *See* Roehl Dep. 42:10–43:9, 71:8–72:5, 74:2–11; Kappelman Decl., Ex. 39, Gage Dep. 89:1–93:1. Event Sales has already been reimbursed for the purchase price of goods that it claims TJX sent in violation of any covenant to ship only resaleable merchandise. Event Sales points to no evidence

indicating that TJX did not, in fact, honor the "total loss" deductions it unilaterally took when it received non-resaleable merchandise.

Aside from reimbursement of amounts paid to TJX under the contract, Event Sales seeks to recover other categories of damages. Specifically, Event Sales claims that TJX is liable for its increased labor, handling, storage, and shipping costs. Comp. ¶ 5.10; *see also* Pl.'s Mem. 17 (discussing damages for shipping charges; increased accounts receivable; costs of trash, pallets, and trailers; storage costs; labor; and shipping charges for Easter merchandise). However, these are precisely the types of incidental and consequential damages that the parties' agreement excluded.[12] Salvage Agreement § 7.1 ("Neither party shall be liable for . . . consequential or incidental damages. . . ."). Because this "contract language [is] unambiguous, we interpret it according to its plain terms." *Farmers Ins. Exchange v. RNK, Inc.*, 632 F.3d 777, 784 (1st Cir. 2011). And according to the plain language of the Salvage Agreement, Event Sales cannot recover these categories of damages.

Under Massachusetts law, a buyer may generally recover incidental and consequential damages resulting from a seller's breach of a contract for the sale of goods. *Logan Equip. Corp. v. Simon Aerials, Inc.*, 736 F. Supp. 1188, 1195 (D. Mass. 1990) (citing Mass. Gen. Laws Ann. ch. 106, § 2-715); *see also* 25 Mass. Prac. Series, Manual on Uniform Commercial Code, §§ 2:109, 2:110 (3d ed., Sept. 2024 Update). However, Massachusetts law also explicitly allows

---

[12] "Consequential damages are those that cannot be reasonably prevented and arise naturally from the breach, or which are reasonably contemplated by the parties." *Delano Grower's Coop. Winery v. Supreme Wine Co.*, 473 N.E.2d 1066, 1075 (Mass. 1985). Such consequential damages can "include any loss of prospective profits." *Id.* "[I]ncidental damages permit recovery of [a party's] reasonable expenses in handling . . . defective goods," *id.*, such as "expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expenses incident to the delay or other breach," Mass. Gen. Laws Ann. Ch. 106, § 2-715(1).

contracting parties to limit or exclude consequential and incidental damages in their agreement, unless the provision is unconscionable. Mass. Gen. Laws Ann. ch. 106, § 2-719(3); *Logan Equip. Corp.*, 736 F. Supp. at 1195 (citing *Canal Elec. Co. v. Westinghouse Elec. Corp.*, 548 N.E.2d 182 (Mass. 1990); *Delano Grower's Coop. Winery v. Supreme Wine Co.*, 473 N.E.2d 1066 (Mass. 1985)); *Marks v. Andersen Windows, Inc.*, No. 1:14-CV-10171-LTS, 2015 WL 13313489, at *12 (D. Mass. Jan. 16, 2015) ("[L]imitations on incidental and consequential damages are enforceable in Massachusetts."). "Limitations on recovery of consequential damages in a corporate context represent 'a reasonable accommodation between two commercially sophisticated parties' which does not offend any public policy of the state." *Logan Equip. Corp.*, 736 F. Supp. at 1195 (quoting *Canal Elec. Co.*, 548 N.E.2d at 185).

The exclusion of incidental and consequential damages in the Salvage Agreement is precisely the kind of allocation of risk between two commercially sophisticated parties that Massachusetts law allows. Under Section 7.1 of the Salvage Agreement, Event Sales and TJX agreed to allocate the risk that either side would experience such damages to the party that was not in breach. They did so by preventing either party from recovering alleged increased shipping, handling, storage, and labor costs (i.e., incidental and consequential damages) incurred from a breach of the agreement. Event Sales bargained for that limitation on its potential recovery for a breach, and it is bound by the limitation unless it is unconscionable.

Although Event Sales asserts that the exclusion of consequential and incidental damages in the Salvage Agreement is unconscionable because of certain typographical errors in Section 7 of the contract, Pl.'s Mem. 4, and because enforcement of the damages exclusion would leave it

with no remedy at all,[13] *id.* at 35–36, the Court finds nothing in the record supports such a determination. "To prove the terms of a contract are unconscionable, a plaintiff must show both substantive unconscionability (that the terms are oppressive to one party) and procedural unconscionability (that the circumstances surrounding the formation of the contract show that the aggrieved party had no meaningful choice and was subject to unfair surprise)." *Storie v. Household Int'l, Inc.*, No. 03-40268-FDS, 2005 WL 3728718, at *9 (D. Mass. Sept. 22, 2005). Event Sales has failed to demonstrate that the exclusion of incidental and consequential damages in the contract is substantively or procedurally unconscionable, let alone that it satisfies both prongs of the conjunctive test for unconscionability.[14]

In addition, the Court finds that Event Sales has failed to produce evidence that TJX was using the salvage program to divert landfill waste to Event Sales by shipping "garbage" instead of merchandise. Indeed, the internal TJX policies instructed employees at the stores not to

---

[13] The argument that Event Sales has no remedy at all ignores the reality that, under the UCC, independent of any incidental or consequential damages, a buyer can recover the purchase price paid for goods that it has rightfully rejected or where the buyer has justifiably revoked acceptance. Mass. Gen. Laws Ann. ch. 106, § 2-711. And where the buyer has accepted goods and provided notice, the buyer "may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." *Id.*, § 2-714(1). The reality is that Event Sales has already helped itself to its available remedy, and it agreed by contract that it would not have recourse to receive more.

[14] Event Sales also suggests that the exclusion of incidental and consequential damages does not apply in this case because TJX engaged in willful misconduct by shipping merchandise in large boxes and stringing Event Sales along by delaying its response to requests for payment of Plaintiff's growing FedEx shipping costs. Pl.'s Mem. 37. But the evidence Event Sales relies on would not permit a reasonable jury to find that TJX engaged in the kind of misconduct that might make the limitation of incidental and consequential damages inapplicable. *See* Salvage Agreement § 7.2(iii), (v) (providing that the provisions of Section 7.1 "shall not apply … (iii) in the event of fraud or fraudulent misrepresentation; … [or] (v) in the event of gross negligence or willful misconduct"). Event Sales points to no intentional misrepresentation or other willful misconduct, nor does it identify any facts that imposed upon TJX a duty to disclose that it was considering other vendors while evaluating Event Sales' request for payment of its FedEx bills.

package things like broken mirrors, opened food items, crushed items, broken glass, recalled merchandise, open or expired food, damp or mildewed merchandise, or items that could cause injury. The record indicates that the volume of salvage merchandise shipments increased as TJX experienced increased consumer demand and had to turn over its own inventory more frequently. Kappelman Decl., Ex. 21, TJX 30(b)(6) Dep. 122:17–25, 129:1–130:22. Even amid that overall increase in salvage merchandise between 2021 and 2024, the percentage of boxes that Event Sales declared to be total losses remained relatively consistent. Kappelman Decl., Ex. 44, Reding Report, Ex. 10; *id.*, Ex. 45, Reding Rebuttal Report at 16 ("I performed an analysis in my November 15, 2024 Report that demonstrates the ratio of unsaleable cartons remained generally consistent across each TJX banner store since at least 2021."). Under these circumstances, even viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could not find that TJX sent an influx of "garbage" to Event Sales to make it appear that it was complying with its environmental sustainability goals.

For these reasons, the Court finds that TJX is entitled to summary judgment on Event Sales' claim that TJX breached the Salvage Agreement through its shipment of merchandise that Event Sales could not resell to its own customers.

### *Carton Size*

Next, TJX seeks summary judgment on Event Sales' claim that TJX breached the contract by shipping salvage merchandise to Event Sales in boxes that were larger than the "Fragile" sized boxes that would minimize its shipping costs from FedEx. TJX argues that the Salvage Agreement included no terms requiring it to ship merchandise in a box of any particular size, and that it instructed its stores to use care in packaging items and to limit the use of larger boxes to only larger items that could not fit in the smaller boxes. TJX Mem. 25. Event Sales

argues that the Court should deny TJX's motion for summary judgment on this claim because the term "carton" as used in Schedule A to the agreement is ambiguous, and during precontract discussions, the parties mutually understood "carton" to mean boxes with the dimensions 24" x 20" x 12" or 24" x 16" x 12". Pl.'s Mem. 22–23.

The Court finds that TJX is entitled to summary judgment on this aspect of Plaintiff's breach-of-contract claim. For starters, Event Sales' damages attributable to this alleged breach of the Salvage Agreement comprise its increased FedEx shipping costs for surcharges based on oversized and otherwise irregular shipments. These increased shipping costs are not direct damages from TJX's attempts to sell allegedly non-conforming goods, but the kind of incidental or consequential damages that can be excluded from an agreement, Mass. Gen. Laws Ann. ch. 106, § 2-719(3), and that were excluded under the express terms of the parties' contract in this case, Salvage Agreement § 7.1.

In addition, there is no explicit provision in the contract requiring TJX to use only boxes of a specific size for shipping salvage goods to Event Sales. Roehl Dep. 34:8–20. Neither the body of the Salvage Agreement, nor the text of Schedules A or B impose such an obligation on TJX. Indeed, Schedule A is the only place the term "carton" appears, and there it does so in connection with the price Event Sales is required to pay per carton from different TJX stores. No mention is made of carton size in the agreement. This means that Event Sales cannot point to an express contract term that TJX allegedly breached, and because the contract is also fully

integrated,[15] Event Sales cannot rely on any pre-formation negotiations to establish its breach-of-contract claim. *See Armstrong v. White Winston Select Asset Funds, LLC*, 648 F. Supp. 3d 230, 263–64 (D. Mass. 2022) (granting defendants' motion for summary judgment where the express terms of the agreement did not provide the obligation the plaintiff alleged was breached and plaintiff relied only on oral representations allegedly made to plaintiff prior to the execution of a fully integrated contract); *Realty Fin. Holdings, LLC v. KS Shiraz Manager, LLC*, 18 N.E.3d 350, 355 (Mass. Ct. App. 2014) ("Generally, contracting parties are understood to have included an integration clause in their written agreement with the intent to preclude the subsequent introduction of evidence of preliminary negotiations or side agreements."); *Perez v. Diaz*, No. 13-P-252, 2025 WL 1649355, at *2 (Mass. Ct. App. June 11, 2025) ("The controlling agreement did not include any right to pay installments in larger amounts, nor did it require defendants to accept such prepayment from the plaintiff. To read in such a term would impermissibly broaden the integrated writing.") (cleaned up). If the parties had a meeting of the minds on carton size, and Event Sales wanted a term capturing that mutual understanding in the Salvage Agreement, it could have insisted that the contract spell out the carton-size limitations it preferred. *ITT Corp v.*

---

[15] Event Sales suggests that a reasonable jury could find the Salvage Agreement is not fully integrated because it is relatively brief, contains some typographical errors, and includes language that suggests it may have been reused from a previous rom contract. However, the Court finds no evidentiary basis to support the assertion that the contract is anything other than a fully integrated agreement. Under Massachusetts law, "the nature of the writing or the situation of the parties may warrant consideration of the parties' negotiations in order to determine whether they intended that the written agreement, even one containing an integration clause, be fully integrated." *Reality Fin. Holdings, LLC v. KS Shiraz Manager, LLC*, 18 N.E.3d 350, 355 (Mass. Ct. App. 2014). The parties here were sophisticated businesses negotiating a salvage contract that covered the essential terms of their contract, so resort to evidence of prior negotiations or practices is unwarranted. *Id.* at 356 ("[W]here, as here, sophisticated business people, represented by counsel, have negotiated and executed a complex written document touching on all significant aspects of their transaction, and have included an integration clause, we need not resort to their prior negotiations concerning the transaction at hand to divine the intention of the parties on the question of integration.") (cleaned up).

*LTX Corp.*, 926 F.2d 1258, 1265 (1st Cir. 1991) ("Had LTX wanted an agreement conditioning its duty to buy back the cable assemblies upon their meeting certain commercial durability standards, it should have declined to sign the agreement as written, since no such clause or statement appears within the contract's four corners."). But Event Sales did not do that, and to read such a term into the Salvage Agreement now would be to impermissibly expand the integrated contract by inserting a carton-size limitation.

Event Sales next contends that the term "carton" is ambiguous and the ambiguity would allow a reasonable jury to find that the parties agreed that any "carton" used to ship salvage goods would be no larger than the "Fragile" sized boxes preferred by Event Sales. "Contract language is usually considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and obligations undertaken." *Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076, 1083 (1st Cir. 1989). It is a bit of a stretch to find that on the face of the contract, the term "carton" could support a reasonable difference of opinion about whether TJX undertook an obligation to use boxes of only a certain size. *See Bank v. Thermo Elemental Inc.*, 888 N.E.2d 897, 907 (2008) ("To answer the ambiguity question, the court must first examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties."). However, even assuming for the sake of argument that there is some ambiguity in the term "carton," a reasonable jury could not find from the evidence in this record that the parties mutually understood "carton" to refer to a specific box size, obligating TJX to use only that size.

The evidence simply does not create a triable issue over whether TJX shared the understanding of the meaning of "carton" that Event Sales now favors. In 1987, when Event

Sales first began purchasing salvage merchandise from Marshalls, Plaintiff's President, Tony Hofstede, testified that the Marshalls stores packaged salvage goods in boxes that were 24 x 16 x 17. He also indicated there was some discussion of establishing "guidelines" that boxes should be packed full and picked up when there were five cartons available. Hofstede Dep. 23:19–24:15. However, the written contract that forms the basis of this dispute was signed 28 years later, in 2015. Event Sales points to a portion of the bid it submitted prior to the execution of the 2015 Salvage Agreement which describes a box size similar to the size discussed by Mr. Hofstede in his deposition. Kletscher Decl., Ex. 6; Roehl Dep. 34:8–20. But Event Sales does not point to any evidence indicating that box size was expressly part of the negotiated terms, nor evidence that indicates TJX understood that the use of the term "carton" in Schedule A meant it could *only* provide boxes of the size mentioned in the pre-contract bid.

To the contrary, even Event Sales understood that certain items simply could not be shipped in smaller boxes due to their size. Kappelman Decl., Ex. 15. And Event Sales' own unilateral Salvage Program Instructions that it provided along with the PRP labels it delivered to TJX requested that TJX "use cartons that have dimensions *close to* 24" x 16" x 17"." Kletscher Aff., Ex. 7 (emphasis added); *see also id.* ("We would rather have you ship several boxes *close to this size* than extremely large boxes as that increases the freight costs for the box.") (emphasis added). While these instructions illustrate Event Sales' preference for smaller boxes so it could control its shipping costs, a reasonable jury could not infer from this evidence anything about TJX's own understanding of what the term "carton" meant, and certainly not that it had agreed the contract's reference to cartons obligated it to ship salvage goods in boxes of any particular

size.[16] Even TJX's internal documents do not reflect that the contract definitively required use of a particular box size. *See, e.g.*, Kletscher Aff., Ex. 27 at 5 (2016 TJX slide presentation discussing "Recommended Carton Size" and indicating that TJX should "[p]rovide standard size box *as often as possible*") (emphasis added).

    For these reasons, TJX is entitled to summary judgment on this claim.

### *Increased Volume and Seasonal Merchandise*

    For similar reasons, the Court finds that TJX is entitled to summary judgment on Plaintiff's claims that TJX breached the Salvage Agreement by (1) increasing the overall volume of merchandise and (2) shipping too much seasonal or holiday merchandise. With respect to Plaintiff's claim that TJX shipped too much seasonal and holiday merchandise, the contract imposes no obligation on TJX to limit the volume of such merchandise. And the seasonal merchandise Event Sales received was not categorically impossible to resell. The undisputed evidence shows that, in fact, Event Sales could resell seasonal or holiday merchandise to some of its customers, but it had to store those items longer. Indeed, the Salvage Agreement says nothing about holiday merchandise, and when Plaintiff agreed to renew the salvage contract with TJX in March 2023, it did not renegotiate the terms of the parties agreement to place limits on the shipment of seasonal goods that some of its customers were uninterested in purchasing.

    With respect to the claim that TJX breached the Salvage Agreement by increasing the overall volume of salvage merchandise it shipped under the contract, Event Sales argues that the contract imposes a limitation on quantity because it is an "output contract." Event Sales contends

---

[16] *Cf. ITT Corp. v. LTX Corp.*, 926 F.2d 1258, 1266 n.7 (1st Cir. 1991) (explaining that the "polar differences in the parties' *actual* understanding of the contract's meaning left no occasion for the court to divine a 'reasonable' interpretation that would reflect a single probable intent to which both parties subscribed" and questioning whether, in the absence of evidence of shared understanding, "any binding contract was made at all").

that the contract, therefore, required TJX not to send Event Sales quantities unreasonably disproportionate to the volume of previous shipments. Pl.'s Mem. 30–32. The Court finds this argument unpersuasive. Under Mass. Gen. Laws ch. 106, § 2-306(1), when a contract for the sale of goods "measures the quantity by the output of the seller or the requirements of the buyer," the seller is prohibited from tendering a "quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output." *Id.* It is not at all clear, however, that the Salvage Agreement measures the quantity in this instance by TJX's output, and the record shows that Event Sales played a direct role in dictating the quantity of salvage merchandise it received by ordering thousands of PRP labels for the TJX banner stores to apply to the boxes that were shipped.[17]  Moreover, even after Event Sales began seeing an increase in the volume of shipments, it continued asking FedEx for more PRP labels. *See* Kappelman Decl., Ex. 5 at 3 (Mar. 16, 2023 Roehl emails requesting HomeGoods labels from FedEx); Roehl Dep. 50:23–51:24. Event Sales did not ask TJX to shop sending merchandise as the volume increased and its FedEx account was past due, but instead sought help with its FedEx bill. Roehl Dep. 52:14–53:21. Under these circumstances, no

---

[17] There appear to be relatively few cases in which Massachusetts courts have applied § 2-306(1). Event Sales points to Comment 3 to § 2-306, but even that comment indicates that the onus is on "the party who will determine quantity. . . ." Mass. Gen. Laws, ch. 106 § 2-306, cmt. 3. Here, TJX did not unilaterally determine output because the volume of shipments depended upon the number of PRP labels that Plaintiff ordered from FedEx and then forwarded to TJX stores. The cases involving "output contracts" that Event Sales cites do not involve similar arrangements where the buyer of goods had the ability to limit the volume of goods it would purchase by simply minimizing its own requests for shipping labels. For example, in *Waste Stream Env't Inc. v. Lynn Water & Sewer Comm'n*, No. 00518D, 2003 WL 917086 (Mass. Super. Ct. Jan. 3, 2003), there was a dispute between a provider of wastewater sludge disposal services and a municipal wastewater treatment facility when the facility drastically increased the output of sludge the plaintiff was required to haul under the agreement. But unlike here, the plaintiff in *Waste Stream* had no mechanism to limit the facility's output that is comparable to what Event Sales could have done here—throttling back its provision of PRP labels to TJX.

reasonable jury could find that TJX breached the parties' agreement by shipping too great a volume.

Accordingly, the Court finds that TJX is entitled to summary judgment on Plaintiff's breach-of-contract claim regarding increased volume and shipments of too much seasonal or holiday merchandise.

### 2. Unjust Enrichment

In Count III of the Complaint, Event Sales asserts that it has suffered damages under a theory of unjust enrichment because TJX disposed of unsaleable items by shipping them to Event Sales at the latter's expense. Compl. ¶¶ 7.1–7.5. "Unjust enrichment is defined as retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Sacks v. Dissinger*, 178 N.E.3d 388, 397–98 (Mass. 2021).[18] A party asserting an unjust enrichment claim must show "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under the circumstances would be inequitable without payment for its value." *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 57 (1st Cir. 2009), *decision clarified on denial of reh'g,* 559 F.3d 1 (1st Cir. 2009).

However, "[a] claim of unjust enrichment . . . is not available to a party with an adequate remedy at law." *Fernandes v. Havkin*, 731 F. Supp. 2d 103, 114 (D. Mass. 2010) (quoting *Ben Elfman & Son, Inc. v. Criterion Mills, Inc.*, 774 F. Supp. 683, 687 (D. Mass. 1991)). "The disposition of [a party's available legal] claims is irrelevant. Their mere availability is a bar to a claim of unjust enrichment." *Id.* (citing *Adrion v. Knight*, No. 07-cv-11277-RGS, 2009 WL

---

[18] Just as they do in connection with the breach-of-contract claims between them, TJX and Event Sales rely on Massachusetts law with respect to Plaintiff's unjust-enrichment claim.

3152885, at *1 n.1 (D. Mass. Sept. 28, 2009) ("the availability of an adequate remedy at law (whether successful or not) precludes an equitable claim of unjust enrichment")); *see also Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 16 (1st Cir. 2017) (explaining that "[i]t is the availability of a remedy at law, not the viability of that remedy, that prohibits a claim for unjust enrichment").

TJX argues that it is entitled to summary judgment on the unjust-enrichment claim because Event Sales has an available remedy at law—a claim for breach of contract. Here, there is no question that the salvage relationship between Event Sales and TJX is governed by a contract—the Salvage Agreement. And that express contract (as well as Event Sales' breach-of-contract claim) covers precisely the same subject matter that is the basis of the unjust-enrichment claim, i.e., TJX's alleged improper shipment of "unsaleable items" to Event Sales in exchange for the latter's payment.[19] And the fact that the Court has found Event Sales cannot prevail on that breach-of-contract claim does not mean Plaintiff "has no adequate remedy." *Shaulis*, 865 F.3d at 16; *see also id.* ("Massachusetts law does not permit litigants 'to override an express contract by arguing unjust enrichment.'") (quoting *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 130 (1st Cir. 2006)). For these reasons, the Court finds that TJX is entitled to summary judgment on Event Sales' unjust enrichment claim, and Count III of the Complaint is dismissed.

---

[19] Event Sales notes that the court in *Secure Our City, Inc. v. ECI Systems, LLC*, observed "the mere existence of a contract between two parties does not mandate that claims for unjust enrichment . . . be dismissed," especially where the unjust enrichment claim "is based upon an issue that is not addressed in the contract. 594 F. Supp. 3d 96, 106–07 (D. Mass. 2022). However, the shipment of TJX's salvage goods in exchange for Event Sales' payment for those goods was precisely the issue addressed by the parties' agreement. This is distinct from the circumstances of *Secure Our City*. There the district court denied the defendant's motion to dismiss the plaintiff's equitable claim because the contract governing the defendant's installation of the plaintiff's security systems did not cover a separate "agreement" by which the defendant agreed to pay a referral fee to the plaintiff for each store in which it installed a security system. *Id.*

### 3. Minnesota Consumer Fraud Act

Count II of Event Sales' Complaint alleges that TJX violated the Minnesota Consumer Fraud Act (MCFA), Minn. Stat. § 325F.69, by deceptively holding itself out to the public as a company committed to reducing landfill waste for the protection of the environment while shipping waste to Minnesota at the expense of Event Sales. Compl. ¶¶ 6.1–6.10. In relevant part, the MCFA provides:

> The act, use, or employment by any person of any fraud, unfair or unconscionable practice, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is enjoinable. . . .

Minn. Stat. § 325F.69, subd. 1.

The Minnesota Legislature has provided for private enforcement of the MCFA through a civil action for damages by a "consumer injured by a violation [of the MCFA] in connection with the sale of merchandise for personal, family, household, or agricultural purposes." Minn. Stat. § 325F.70, subd. 3(a). As defined by this remedies provision, a consumer is "a natural person or family farmer." *Id.*, subd. 3(b). Aside from these consumers, the MCFA contemplates enforcement by the Minnesota attorney general or a county attorney through civil actions seeking injunctive relief. *Id.*, subd. 1. Otherwise, "a plaintiff suing for violations of [the MCFA] must pursue relief under Minnesota's Private Attorney General Statute ("Private AG Statute")," Minn. Stat. § 8.31, subd. 3a. *Johnson v. Bobcat Co.*, 175 F. Supp. 3d 1130, 1140 (D. Minn. 2016). To use the Private AG Statute, the plaintiff "must 'demonstrate that their cause of action benefits the public.'" *Id.* (quoting *In re Levaquin Prods. Liab. Litig.*, 752 F. Supp. 2d 1071, 1076 (D. Minn. 2010)).

This requirement of a public benefit is a "necessary element of a plaintiff's cause of action under the Private AG Statute." *Gisairo v. Lenovo (United States), Inc.*, 516 F. Supp. 3d 880, 889 (D. Minn. 2021) (cleaned up). "Generally, a public benefit is found when the plaintiff seeks relief primarily aimed at altering the defendant's conduct (usually, but not always, through an injunction) rather than seeking remedies for past wrongs (typically through damages)." *Id.* (internal quotations omitted). But the mere fact that a plaintiff has requested an injunction "is not dispositive." *Id.* In determining whether this public-benefit requirement is satisfied, courts consider how the alleged misrepresentations by the defendant affected the public; the way the alleged misrepresentation was made; the nature of the relief sought by the plaintiff; and whether there remain ongoing misrepresentations. *Id.* "Without more, allegations of false or misleading advertising . . . are insufficient to establish a public benefit." *Id.* at 890.

TJX argues that it is entitled to summary judgment on Plaintiff's MCFA claim because this case does not serve a public benefit. Event Sales argues that it has satisfied the public-benefit requirement because TJX made its allegedly false representations concerning commitment to the environment and reduction of contributions to landfill waste to the public at large and it seeks to enjoin TJX from making further shipments of salvage goods to Minnesota while using its salvage operations as the means by which it meets its environmental goals. The Court finds that TJX has the better of the argument and grants its motion for summary judgment on Plaintiff's MCFA claim.

The immediately apparent purpose for which Event Sales brought this lawsuit is the recovery of money damages for alleged past harms caused by TJX's performance under the parties' Salvage Agreement. The essence of Event Sales' lawsuit in this case is not curbing false statements to the public by TJX, but seeking redress for Event Sales' commercial losses. *Select*

*Comfort Corp. v. Tempur Sealy Int'l, Inc.*, 11 F. Supp. 3d 933, 939–40 (D. Minn. 2014). As such, "[t]he relief sought does not appear to be primarily directed to altering [TJX's] conduct but instead to receiving monetary damages." *Gisairo*, 516 F. Supp. at 890 (citing *Buetow v. A.L.S. Enter., Inc.*, 888 F. Supp. 2d 956, 960 (D. Minn. 2012); *Select Comfort*, 11 F. Supp. 3d at 939).

Moreover, the Court finds Plaintiff's requests for injunctive relief are insufficient to establish that the case has a public benefit sufficient to allow Event Sales to pursue its MCFA claim under the Private AG Statute. In mid-2023, TJX located another vendor for its salvage operation and eventually decided to stop using Event Sales. *See* Kletscher Aff., Ex. 26. The replacement vendor is not located in Minnesota. *Id.* at 8. The record also shows that TJX no longer sends salvage merchandise to Event Sales (aside from an occasional stray carton), and in August 2023, TJX instructed its stores to destroy remaining PRP labels for Event Sales' shipments. Kappelman Decl., Ex. 26. These facts undermine the notion that Event Sales' MCFA claim benefits the public of Minnesota—its requests for injunctive relief will do little, if anything, to protect Minnesota citizens against TJX's alleged profligate contributions of waste in Minnesota landfills.[20]

For these reasons, the Court grants TJX's motion for summary judgment on Event Sales' MCFA claim and dismisses Count II of the Complaint.

## B. TJX's Breach of Contract Counterclaim

TJX also moves for summary judgment against Event Sales on its counterclaim for breach of contract. The Court finds that TJX is entitled to summary judgment. There is no dispute that Event Sales stopped paying TJX for salvage merchandise Event Sales received

---

[20] The relief sought in the Complaint includes orders enjoining TJX from "shipping items that would otherwise enter into the waste system to or from Minnesota" and from "publicly holding itself out as committed to reducing landfill waste." Compl., Prayer for Relief ¶¶ 2–3.

beginning in December 2022. Nevertheless, Event Sales continued to receive shipments from TJX after December 2022. TJX has presented evidence showing that Event Sales owes TJX $1,115,832 in unpaid invoices for the salvage merchandise it received pursuant to the Salvage Agreement from December 2022 through July 2024. Reding Report at 9–10 & Table 1. That calculation accounts for all "adjustments and/or deductions made by Event Sales that were not agreed upon by the parties," *id.* at 9, meaning that it construes all disputes over payment terms in Plaintiff's favor, giving Plaintiff credits it believes should be applied even though TJX could argue it is owed more. Event Sales does not present evidence creating a genuine dispute of material fact that TJX is owed these amounts. Accordingly, the Court finds that TJX is entitled to summary judgment on its own breach-of-contract claim against Event Sales in the amount of $1,115,832.

       TJX also argues that it is entitled to costs, fees, interest, and expenses incurred to collect the delinquent amounts—including court costs and attorney's fees. The Salvage Agreement requires Event Sales to make payments owed to TJX "within sixty (60) days of each month end according to the monthly reconciliation reports." Salvage Agreement § 2.1. Further, the contract provides:

> Any remittance not made to TJX within such 60-day period shall be subject to a 1.5% per month interest charge. In the event that [Event Sales] is delinquent in any remittance(s) due hereunder, and TJX engages an attorney and/or institutes legal proceedings for the collection of said delinquent remittance(s) and the latter incurred court costs and/or attorney fees, TJX shall be entitled to recover from [Event Sales] all costs, expenses and fees incurred by TJX in collecting the delinquent remittance(s).

*Id.* § 2.2.

       While these contractual provisions contemplate that Event Sales will be required to pay TJX interest on past-due remittances owed under the Salvage Agreement and, in essence,

indemnify TJX for court costs and attorney's fees incurred in an action for contractual damages, the parties have not addressed these matters in any significant detail. The parties' briefing does not point to an appropriate calculation of the contractual interest that is allegedly due to TJX, the amount of court costs TJX seeks to recover, or the attorney's fees to which TJX believes it is entitled. It is also unclear whether, under Massachusetts law, as would be the case under Minnesota law,[21] Event Sales would be entitled to a jury trial on the issue of the availability of attorney's fees or the amount.

The parties are directed to meet and confer regarding any remaining issues, discuss the possibility of resolving these matters without the need for judicial intervention, and provide the Court with a joint letter within thirty days of the date of this Order discussing the outcome of those conversations. Upon receipt of the parties' joint submission, the Court will either issue further orders as deemed appropriate or may set a status conference to discuss next steps. Because it appears that fewer than all claims have been resolved, at this time, the Court will not enter final judgment. *See* Fed. R. Civ. P. 54(b).

## ORDER

For the reasons set forth above, **IT IS HEREBY ORDERED THAT**

1.   FedEx's Motion for Partial Summary Judgment (Doc. 51) is **GRANTED** as follows:

    a.   Plaintiff's claim against FedEx for a declaratory judgment (Count IV) is **DISMISSED**; and

    b.   FedEx is entitled to judgment as a matter of law on its breach-of-contract counterclaim against Event Sales, Inc. in the amount of $6,291,636.39 for unpaid shipping costs incurred by Event Sales between December 2022 and June 12, 2023.

---

[21] *See United Prairie Bank-Mountain Lake v. Haugen Nutrition Equip., LLC*, 813 N.W.2d 49, 51–52 (Minn. 2012) (holding that the Minnesota Constitution provides the right to a jury trial for a claim to recover attorney fees based on a contract).

2.      TJX's Motion for Summary Judgment (Doc. 58) is **GRANTED** as follows:

    a.  Plaintiff's claims against TJX for breach of contract (Count I), unfair business practices under Minn. Stat. § 325F.69 (Count II), unjust enrichment (Count III), and for a declaratory judgment (Count IV) are **DISMISSED**; and

    b.  TJX is entitled to judgment as a matter of law on its breach-of-contract counterclaim against Event Sales, Inc. in the amount of $1,115,832.

3.      TJX's Motion to Exclude Expert Testimony (Doc. 60) is **DENIED WITHOUT PREJUDICE**.

4.      TJX and Event Sales shall meet and confer to discuss TJX's request for an award of interest, court costs, and attorney fees, and within thirty days of the date of this Order, they shall provide a joint letter to the Court setting forth the substance of their communications and any agreements reached.

Date: July 1, 2025

*s/Katherine Menendez*
Katherine Menendez
United States District Judge